**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **ROGER H. PRUITT, JR.,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 1:22cv00011 |
| v. | ) | |
| | ) | **REPORT AND** |
| **KILOLO KIJAKAZI,** | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I.  Background and Standard of Review*

Plaintiff, Roger H. Pruitt, Jr., ("Pruitt"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Pruitt protectively filed his application for DIB on October 3, 2014, alleging disability as of September 11, 2015,[1] based on back problems, diabetes and left knee problems. (Record, ("R."), at 60, 71, 169-70, 185.) The claim was denied initially and upon reconsideration. (R. at 85-87, 94-102.) Pruitt then requested a hearing before an administrative law judge, ("ALJ"). (R. at 103-04.) The ALJ held a hearing on March 16, 2017, at which Pruitt was represented by counsel. (R. at 34-59.) The ALJ issued an unfavorable decision on October 31, 2017, finding Pruitt was not disabled within the meaning of the Act from August 15, 2012, the alleged onset date, through December 31, 2016, the date last insured. (R. at 17-29.) After the ALJ issued his decision, Pruitt pursued his administrative appeals. (R. at 164.)

Although the Appeals Council's decision is not included in the administrative record submitted to the court, the Appeals Council must have upheld the ALJ's decision because Pruitt appealed the decision to this court. On the Commissioner's motion, the case was remanded back to the ALJ for further consideration by this court. (R. at 473-74.) By Order Of Appeals Council, dated August 29, 2019, the final decision of the Commissioner was vacated, and the case was remanded to the ALJ with instructions to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed residual capacity limitations on Pruitt's occupational base, noting that the hypothetical questions should reflect the specific

---

[1] Pruitt initially alleged an onset date of August 15, 2012, which he later amended to September 11, 2015. (R. at 391, 569.)

capacity/limitations established by the record as a whole. (R. at 483-84.) The ALJ also was instructed to address the evidence which was submitted to the Appeals Council, take any further action needed to complete the administrative record and issue a new decision. (R. at 484.) Upon remand, the ALJ held a hearing on February 28, 2020, at which Pruitt, again, was represented by counsel. (R. at 411-43.)

By decision dated April 13, 2020, the ALJ denied Pruitt's claim. (R. at 391-404.) As stated above, Pruitt amended his alleged onset date from August 15, 2012, to September 11, 2015. (R. at 391, 569.) The ALJ found that Pruitt met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016.[2] (R. at 392-93.) The ALJ found Pruitt had not engaged in substantial gainful activity from September 11, 2015, through December 31, 2016. (R. at 393.) The ALJ determined that, through the date last insured, Pruitt had severe impairments, namely lumbar spine degenerative disc disease with history of lumbar spine surgery; left knee arthritis and possible meniscal injury; obesity; and diabetes, but he found Pruitt did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 393-94.) The ALJ found that, through the date last insured, Pruitt had the residual functional capacity to perform sedentary[3] work, except he could not push, pull, lift or carry more than 10 pounds; there could be almost no stooping (i.e. negligible), as an independent posture, apart from the

---

[2] Therefore, Pruitt must show he was disabled between September 11, 2015, and December 31, 2016, to be eligible for DIB benefits.

[3] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2022).

bending at the waist required to achieve a seated position (i.e. stoop/bend at the waist once for each time taking a seated position); he could occasionally crouch, climb steps and balance, but he could not crawl or climb ladders or scaffolds, and he could not kneel; he would need to stand up to five minutes each hour from a seated position at the workstation; he should avoid hazards, such as machinery with moving parts and unprotected heights; and he could frequently, but not constantly, reach, bilaterally. (R. at 395.) The ALJ found that, through the date last insured, Pruitt was unable to perform any past relevant work. (R. at 402.) In addition, based on Pruitt's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, Pruitt could perform the jobs of an addressing clerk and a document preparer, which existed in significant numbers in the national economy. (R. at 402-03.) Thus, the ALJ concluded that, through the date last insured, Pruitt was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 404.) *See* 20 C.F.R. § 404.1520 (g) (2022).

After the ALJ issued his decision, Pruitt pursued his administrative appeals, (R. at 562-68), but the Appeals Council denied his request for review. Pruitt then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2022). This case is before this court on Pruitt's motion for summary judgment filed January 16, 2023, and the Commissioner's motion for summary judgment filed February 15, 2023.

## II. Facts[4]

Pruitt was born in 1969, (R. at 169), which, on the date last insured, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). Pruitt has a high school education with a year of college education and training in carpentry. (R. at 186.) He has past work as a molding machine operator, a cloth cutting machine operator, a stocker, a molding supervisor and a seat maker. (R. at 53-54.) At the March 16, 2017, hearing, Pruitt testified he injured his back while at the training academy to become a corrections officer. (R. at 39, 43.) He returned to work, but ultimately had to quit his job as a molding machine operator in 2012 due to worsening back and leg pain. (R. at 38-39, 43.) Pruitt stated he did not apply for other jobs that did not require as much standing. (R. at 40.) Pruitt said that standing, walking and sitting bothered him at work, noting he had to get up and move around. (R. at 44, 46.) Specifically, he said sitting straight up caused hip pain due to spasms. (R. at 46.) Pruitt said his family doctor treated his pain for a while with anti-inflammatories and muscle relaxers, but eventually sent him back to pain management, where he received a nerve block, which helped him sleep some, but it did not help his pain, which continued to worsen. (R. at 41.)

Pruitt stated he had experienced back problems since the mid-1990s, for which he had undergone surgery. (R. at 39.) He described spasms and hip pain that radiated down his leg; he could hardly bend, and doing so caused spasms or shooting pain, typically down the right leg, but sometimes the left leg. (R. at 40.) Pruitt said this pain was helped most by reclining with his arms placed above his head, which

---

[4] The court will limit its discussion to those facts relevant to the time between September 11, 2015, Pruitt's amended alleged onset date, and December 31, 2016, his date last insured, except as otherwise relevant to the court's decision.

he spent most of his day doing and which he began doing within six months to one year after leaving work.  (R. at 42, 46.)  He testified if he did not elevate his legs, the stiffness made the spasm worsen.  (R. at 52.)  Pruitt stated he could drive a vehicle. (R. at 53.)

Pruitt also testified he hurt his knee in the late 1980s, which surgery helped for a while.  (R. at 41.)  However, he said it started bothering him again in the late 1990s, which another surgery helped for a couple of years.  (R. at 41.)  Pruitt stated the pain had begun to worsen when he tore cartilage after stepping off his porch in November 2016, which he had been advised might require another surgery.  (R. at 41-42, 48.)  He reported receiving injections for the past year and a half and had been advised if the pain returned, he would be referred to a surgeon.  (R. at 41.) Pruitt said a limp caused by his knee pain exacerbated his back spasms.  (R. at 42.) Pruitt stated his left knee hurt constantly, but he did not require an assistive device. (R. at 42, 48.)  He said knee replacement had been discussed when he reached his late 50s or early 60s.  (R. at 49.)

Pruitt described a good day as being able to go outside and walk around for a little bit and sit on his porch for 40 to 45 minutes, noting he could not stay in one spot for too long.  (R. at 46.)  He described a bad day as being in the recliner or bed all day, estimating he had three or four bad days weekly.  (R. at 49.)  Pruitt said he could not do any household chores, such as cooking, cleaning, making beds or doing laundry.  (R. at 47.)  When asked about hobbies, Pruitt stated he and his wife attended monthly family nights at his mother-in-law's house, and he and his wife watched a lot of movies at home.  (R. at 47.)  Although he used to hunt and fish, he had not done so in the past two years, as his back would not allow him to sit still.  (R. at 48.)

Pruitt also reported having insulin-dependent diabetes. (R. at 49, 51.) He stated that steroid injections caused his blood sugar levels to dramatically increase. (R. at 50.) Pruitt also reported seeing an eye doctor because he could not see for three days due to his high blood sugar levels. (R. at 50-51.) However, Pruitt testified he wore only reading glasses. (R. at 51.) Pruitt reported some tingling in his feet. (R. at 52.)

At the February 28, 2020, hearing, held after remand by this court, the ALJ noted that Pruitt had changed age categories to a "person closely approaching advanced age" under 20 C.F.R. §404.1563(d). (R. at 415.) Pruitt reiterated his previous testimony that he hurt his back while at the corrections officer training academy and that he continued to have back problems since that time, which gradually worsened. (R. at 421.) Initially, he stated, he underwent physical therapy and took anti-inflammatories and muscle relaxers, which stopped helping enough to allow him to work. (R. at 421, 427.) He stated he also had undergone an ablation on his back, which did not help. (R. at 422.) Pruitt explained that he waited so long to file for disability in hopes that his back would improve enough to return to work. (R. at 423.) He testified he first saw his pain management specialist in 2009 following his injury, after which he was able to return to work for a while, but on a part-time basis. (R. at 424-25.) However, his back continued to worsen. (R. at 425.) Thereafter, Pruitt returned to pain management in 2015, where he typically received treatment every three to four months, including two cortisone shots in his back and two in his knee. (R. at 424, 427-29.) Although Pruitt stated these shots caused his blood sugar to rise into the 800s for a week or two, he described his diabetes as "pretty much under control," and he noted he had lost weight. (R. at 429.) He also testified he had undergone surgery in the mid-1990s after suffering from two slipped discs and a deteriorating disc. (R. at 421-22.)

Pruitt also testified his knees continued to bother him. (R. at 428.)  He described a bad day, which he had three to six times monthly, as having a "really hard" time getting up from a seated position, and he would either be in the recliner or the bed for at least two to three days.  (R. at 429-30.)  He stated he had other days where he reclined a couple of times daily with his hands over his head, on average for one to two and a half hours.  (R. at 430-31.)  According to Pruitt, he hurt daily, and while his pain management providers helped eliminate his main pain when he got really down, the muscle relaxers and anti-inflammatories, combined with daily reclining, helped as much as the pain pills.  (R. at 431.)  Pruitt testified he took Percocet, meloxicam and a muscle relaxer.  (R. at 432-33.)

In rendering his decision, the ALJ reviewed medical records from Jonathan Shelton, P.A.-C, a certified physician assistant; New River Valley Medical Center; Bland County Medical Center; Heartland Rehabilitation Services – Wytheville; Wytheville Family Medicine; Wythe County Community Hospital; Dr. Craig Hartranft, M.D.; Wythe Medical Associates, Inc.; Dr. Robert Stephenson, M.D.; Dr. Murray Joiner, M.D.; Dr. Robert McGuffin, M.D., a state agency physician; and Dr. Bert Spetzler, M.D., a state agency physician.

On December 29, 2014, Jessi Evans, P.T., a physical therapist with Heartland Rehabilitation Services – Wytheville, completed an examination of Pruitt at the request of Disability Determination Services.[5]  (R. at 249-52.)  Evans noted Pruitt had slumped posture, and he sat with his weight shifted to the right and with his left knee partially extended.  (R. at 249.)  Sensation was intact, but there was atrophy in

---

[5] Evans's evaluation predates Pruitt's alleged onset date by approximately nine months. However, because Pruitt alleges the ALJ improperly considered it, the undersigned includes it herein.

the left quadriceps muscle compared to the right; he had a left antalgic gait pattern, and he could not climb ladders, but he required no assistive device.  (R. at 249-50.) Pruitt refused to perform several activities due to an inability to perform them, including stooping and crouching.  (R. at 250.)  Evans opined Pruitt could sit for less than four hours, stand for less than four hours and walk for less than two hours in an eight-hour workday.  (R. at 250.)  She opined Pruitt could lift/carry 10 pounds frequently and 20 pounds occasionally with weight shifted to the right.  (R. at 250.) She opined he could occasionally bend and frequently reach, grasp, feel and finger. (R. at 250.)  Evans found no communicative limitations or limitations on driving or related to noise, but she noted that cold weather increased Pruitt's pain, and he avoided excessive heights.  (R. at 250.)  On a neurological evaluation, Evans found Pruitt had full strength in all extremities; normal coordination and normal gait with most activities; normal station on both feet, but mildly abnormal when standing on just the right foot and moderately abnormal when standing on just the left foot; and normal reflexes.  (R. at 251.)  Pruitt's back and left knee range of motion were decreased, but his shoulder, elbow, hip, ankle and wrist range of motion were normal, bilaterally.[6]  (R. at 252.)

Left knee x-rays from the same date showed no significant abnormality.  (R. at 253.)  X-rays of Pruitt's lumbar spine showed at least moderate narrowing of the L5-S1 disc space with large hypertrophic spurs and degenerative changes at this level.  (R. at 254.)  There also were small hypertrophic spurs involving the lower thoracic spine and upper two lumbar disc spaces.  (R. at 254.)

On February 11, 2015, Dr. Robert McGuffin, M.D., a state agency physician,

---

[6] Range of motion in the left ankle was reduced by only two degrees.  (R. at 252.)

completed a physical residual functional capacity assessment of Pruitt in connection with the initial assessment of his claim.  (R. at 65-67.)  He opined Pruitt could frequently lift/carry items weighing 10 pounds and occasionally lift/carry items weighing 20 pounds; stand and/or walk a total of about six hours in an eight-hour workday; sit a total of about six hours in an eight-hour workday; push and/or pull up to the lift/carry restrictions; occasionally climb ramps, stairs, ladders, ropes and scaffolds, stoop, kneel, crouch and crawl; and frequently balance.  (R. at 66-67.)  Dr. McGuffin also found Pruitt should avoid concentrated exposure to hazards, such as machinery and heights.  (R. at 67.)  He based these limitations on Pruitt's degenerative disc disease and degenerative joint disease of the back and knee, as well as mild obesity, arthritis and diabetes mellitus.  (R. at 66.)  Dr. McGuffin imposed no manipulative, visual or communicative limitations.  (R. at 67.)

On June 15, 2015, Dr. Bert Spetzler, M.D., another state agency physician, completed a physical residual functional capacity assessment in connection with the reconsideration of Pruitt's claim, affirming Dr. McGuffin's findings.  (R. at 78-80.)  In addition, he explained that Pruitt's postural limitations were based on his osteoarthritis, degenerative joint disease and obesity.  (R. at 79.)

Pruitt presented to the office of Dr. Murray E. Joiner, Jr., M.D., a pain management specialist, on August 18, 2015, with complaints of chronic low back pain radiating into the right leg to the knee, which had worsened.  (R. at 786.)  He also complained of left knee pain, causing it to often "give out."  (R. at 786.)  Christopher S. Howell, P.A.-C, a certified physician assistant, found Pruitt's back pain consistent with facet syndrome of the lumbar spine.  (R. at 786.)  Pruitt stated it was very difficult to walk in the morning, to walk up steps, to stand in one position for a prolonged period and to sit for a long period.  (R. at 786.)  He reported that

position changes improved his pain.  (R. at 786.)  Pruitt stated that, at times, the act of rising from or sitting into a chair caused excruciating pain that seized his back and made it almost impossible to continue the activity.  (R. at 786.)  Pruitt further reported his diabetes currently was not well-controlled, despite being on a host of medications.  (R. at 786.)

On examination, Pruitt had good pulses in all extremities, with no peripheral edema; pain over the medial joint line of the left knee, without erythema or swelling, and pain over the pes anserine bursa of the left knee; pain over the facet joints of the lumbar spine, bilaterally, right greater than left, as well as pain over the paravertebral muscles, and pain with facet joint loading; modified sitting straight leg raise testing was negative, bilaterally; no SI joint tenderness to palpation; grossly intact cranial nerves; +2/4 deep tendon reflexes; intact sensation; and full strength throughout.  (R. at 787-88.)  Howell diagnosed lumbosacral pain and spasms; degenerative disc disease; post-laminectomy syndrome and facet syndrome, lumbar region; right knee pain; and pain over the left pes anserine bursa.  (R. at 788.)  He scheduled facet joint injections at the L3 to S1 levels, starting with the right and moving to the left.  (R. at 788.)  Howell also ordered lumbar spine and left knee MRIs, and he noted Pruitt might benefit from a left knee nerve block and an injection to the pes anserine bursa on the left side.  (R. at 788.)  He informed Pruitt of the disadvantages of bedrest and the need to remain as active as possible.  (R. at 788-89.)

An MRI of the lumbar spine, dated September 11, 2015, revealed rather severe narrowing of the L5-S1 disc space with desiccation; and a small posterior disc herniation with associated spurring, which contacted the S1 nerve roots, bilaterally, and resulted in at least mild narrowing of the foramina, bilaterally, but no significant nerve root encroachment.  (R. at 368.)  It also showed degenerative changes in the

posterior facets at all lumbar disc spaces; and mild narrowing of the spinal canal at the L2-L3 and L4-L5 spaces due to ligamentum flavum hypertrophy and posterior facet degeneration. (R. at 368.) An MRI of the left knee, dated September 17, 2015, revealed status-post resection of portions of the medial meniscus with the mid-body no longer present as well as a significant portion of the posterior aspect; there was internal signal within the remaining posterior portion of the medial meniscus, but a well-defined tear was not seen; the lateral meniscus was intact; there was a degenerative signal in the quadriceps tendon with prominent superior patellar spur; minimal fluid was noted at the location of the popliteal cyst, which may be a very minimal collapsed cyst; no ligament tear was seen; and there was a mild irregularity in the medial articular cartilage. (R. at 369-70.)

Pruitt saw Dr. James B. Stone, III, M.D., his primary care provider, at Wytheville Family Medicine, on October 29, 2015, for a follow up on his diabetes. (R. at 308.) Dr. Stone noted that Pruitt had been an insulin-dependent diabetic since the mid-1990s and that he was a "difficult diabetic to control." (R. at 309.) He indicated Pruitt's significant problems with his knees, including undergoing two scoping procedures and being advised he eventually would need a left knee replacement at a later age. (R. at 309.) Dr. Stone noted that Pruitt had not worked for at least three years, primarily due to degenerative joint disease of the knees and chronic low back pain with disc surgery and chronic residual pain. (R. at 309.) He further stated Pruitt's diabetes was poorly managed, noting his fasting blood sugar was 250, and his A1c was 7.9. (R. at 309.) Dr. Stone diagnosed diabetes and lumbar degenerative disc disease. (R. at 312.)

Pruitt returned to Howell on March 16, 2016, with complaints of "quite severe" left knee pain, as well as a sharp, stabbing pain in his back that followed a

right L4 nerve root pattern a couple of weeks previously. (R. at 783.) He stated the back pain had resolved over the prior several days. (R. at 783.) Howell noted that Pruitt was taking Norco sparingly. (R. at 783.) On examination, he was in no acute distress; he had peripheral pulses in all extremities; there was no cyanosis or edema in the lower extremities; he had tenderness over the paravertebral muscles of the lumbar spine; there was pain with deep palpation over the SI joint line, bilaterally, as well as with facet loading; there was no SI joint tenderness to palpation; modified sitting straight leg raise testing was negative, bilaterally; cranial nerves were grossly intact; deep tendon reflexes were +2/4; sensation was intact; and strength was +5/5 throughout. (R. at 783-84.) Howell diagnosed chronic lumbosacral pain and spasms; chronic bilateral knee pain, left worse than right; degenerative disc disease of the lumbar spine; post-laminectomy syndrome of the lumbar spine; and facet syndrome of the lumbar spine. (R. at 784.) Howell administered a nerve block in the left knee. (R. at 784.) Pruitt was, again, informed of the pitfalls of a sedentary/inactive lifestyle and the negative impact on mental status, health and pain. (R. at 784.)

Pruitt saw Howell on August 18 and December 14, 2016, with continued complaints of low back pain and left knee pain. (R. at 777, 780.) On August 18, 2016, he reported having undergone a bilateral radiofrequency neurotomy from L2 to L5, but his pain had continued to worsen. (R. at 780.) Pruitt had "quite exquisite" pinpoint tenderness over the right paravertebral musculature of the low back. (R. at 780.) However, Howell noted Pruitt was out of his pain medications, which he used sparingly. (R. at 780.) On examination, Pruitt had pain over the paravertebral muscles of the lumbar spine, with pinpoint tenderness over the right lower lumbar region; mild discomfort with deep palpation over the facet joint line, bilaterally, as well as with facet loading, but no SI joint tenderness; and +2/4 deep tendon reflexes. (R. at 780-81.) All other findings were normal, including negative modified sitting

straight leg raise testing, bilaterally; intact sensation; and full strength throughout. (R. at 781.) Howell added myofascial pain to Pruitt's diagnoses and administered a Toradol injection in his back. (R. at 781.) On December 14, 2016, Pruitt complained of continued excessive left knee pain after walking down some steps and feeling a pop, for which he requested a pain injection. (R. at 777.) Howell again noted Pruitt used pain medications sparingly. (R. at 777.) Examination revealed a full, but painful, range of motion of the left knee, without swelling, erythema or other signs of infection; and tenderness over the lumbar paravertebral muscles. (R. at 778.) Otherwise, findings remained normal and unchanged from the previous visit. (R. at 777-78.) Howell diagnosed chronic lumbosacral pain and spasms; degenerative disc disease of the lumbar spine; post-laminectomy syndrome of the lumbar spine; facet syndrome of the lumbar spine, improved substantially with rhizotomy, performed bilaterally from L2 to L5; bilateral knee pain, primarily worse on the left than right, somewhat acute in nature; and myofascial pain. (R. at 778.) He administered another left knee nerve block. (R. at 778.) At both visits, Pruitt reported his pain medications allowed him to perform activities of daily living. (R. at 777, 780.)

Pruitt saw Dr. Michael Stoker, M.D., at Wythe Medical Associates, Inc., on December 30, 2016, to establish as a new primary care patient. (R. at 359.) On examination, he was alert, oriented, pleasant and cooperative; he had no clubbing, cyanosis or edema of the extremities; peripheral radial pulses were 2+; and neurological exam was normal, with no tremor or rigidity and a normal gait. (R. at 359-60.) Dr. Stoker diagnosed transient visual loss of the left eye; Type 2 diabetes mellitus without complication; and essential hypertension. (R. at 360.) He scheduled a carotid ultrasound and continued Pruitt on his current medications. (R. at 360.) This carotid ultrasound was performed on January 5, 2017, and revealed only mild disease, bilaterally. (R. at 353-54.) Specifically, it showed Pruitt was in

the less than 50 percent stenosis category, bilaterally; and antegrade flow was noted in both vertebral arteries.  (R. at 353-54.)  When Pruitt returned to Dr. Stoker on January 30, 2017, he denied blurred vision and diminished visual acuity, among other things.  (R. at 358.)  Pruitt's examination remained normal and unchanged.  (R. at 357.)  On February 27, 2017, he reported doing fairly well and tolerating his medications, but his blood sugar was running high.  (R. at 355.)  He denied decreased sensation in the extremities, balance difficulty, coordination difficulties, tingling and numbness, but he reported headaches.  (R. at 355.)  Examination continued to yield normal findings.  (R. at 356.)  Dr. Stoker changed one of Pruitt's diabetes medications to Farxiga.  (R. at 356.)  On March 20, 2017, Pruitt returned to Dr. Stoker, reporting he was doing well on Farxiga, with only one blood sugar reading greater than 300.  (R. at 674.)  Again, physical examination was completely normal, including no clubbing, cyanosis or edema of the extremities; normal motor strength; and normal gait.  (R. at 674.)

Pruitt saw Christopher Webb, F.N.P., a family nurse practitioner at Dr. Joiner's office, on March 21, 2017, with unchanged pain, which he described as burning and stabbing at times, worse in the mornings and with increased activities, and somewhat better with heat, rest and medications.  (R. at 775.)  Pruitt stated he took Norco sparingly, and he reported he had experienced increased blood sugar levels in the past with steroids.  (R. at 775.)  Webb noted Pruitt was taking Norflex, Ultracet and Norco, as needed, and meloxicam, which he felt was helpful.  (R. at 775.)  On examination, Pruitt had painful range of motion of the left knee; there was crepitus of the left knee, but no edema, erythema or instability; and deep tendon reflexes were 2/4.  (R. at 776.)  Otherwise, findings were normal, including, no tenderness to palpation of the lumbar spine or paraspinal muscles; no SI joint tenderness; negative seated straight leg raise testing; sensation was intact; and

strength was 5/5 throughout.  (R. at 775-76.)  Webb diagnosed chronic low back pain and spasm; lumbar degenerative disc disease and spondylosis; post-laminectomy syndrome; lumbar facet mediated pain, improved status-post radiofrequency ablation; and bilateral knee pain secondary to osteoarthritis.  (R. at 776.)  Webb continued Pruitt's medications and increased his meloxicam.  (R. at 776.)

Pruitt saw Dr. Robert B. Stephenson, M.D., for a consultative examination on March 22, 2017, at his counsel's request.  (R. at 376.)  Dr. Stephenson noted Pruitt's history of back surgery, 2009 MRI findings and treatment by pain management, including facet blocks, epidural steroid injections and a rhizotomy procedure.  (R. at 376.)  He further noted that Pruitt continued to see pain management regularly with occasional trigger point injections and ongoing oral medications.  (R. at 376.)  According to Pruitt, he spent at least three hours daily stretched out in a recliner for back pain control.  (R. at 376.)  Although he reported an ability to do some limited household activities, he could not do anything involving floor to waist lifting or twisting activities.  (R. at 376.)  Pruitt reported intermittent radiation of pain into the right leg down to the calf at times with occasional numbness, as well as lesser pain extending down into the left thigh to the left knee region on a less frequent basis.  (R. at 376.)  More commonly, Pruitt reported intermittent, severe spasms in the low back and gluteal regions, radiating into both hips, right side much worse than the left.  (R. at 376-77.)  Pruitt reported severe spasms averaging once weekly that caused him to be largely immobile for much of the day.  (R. at 377.)  He reported previous physical therapy did not help a great deal, but a TENS unit helped somewhat, medications helped, and lying supine in a recliner or in a bed was the best position for his back.  (R. at 377.)  Pruitt stated walking was the worst activity for his back pain, but he could sit in a chair for brief periods without pain if he had back

support.  (R. at 377.)  Pruitt also reported left knee problems, dating back to around 2009 or 2010, for which he had undergone two arthroscopic procedures for a torn medial meniscus with some improvement.  (R. at 377.)  Pruitt reported significantly increased left knee pain with walking in November or December 2016, which had persisted without significant improvement.  (R. at 377.)

On examination, Pruitt walked and moved slowly and stiffly; both upper extremities had full range of motion, and he had normal fine and gross motor coordination in both hands; there was mild, diffuse tenderness along the lower thoracic and lumbar paraspinal muscles, right more than left, with moderate muscle tightness; diffuse tenderness over the midline lower lumbar laminectomy incision; the SI joints were nontender; range of motion of the thoracolumbar spine showed 60 degrees forward flexion with five degrees of extension and 20 degrees each of lateral bending; there was pain and stiffness, especially on extremes of flexion and extension; there was good range of hip motion, bilaterally; the greater trochanter was nontender, bilaterally; straight leg raise testing was negative to 60 degrees on the right and 50 degrees on the left, with significant hamstring tightness, left more than right; there was full range of motion of the right knee, without pain and stable ligaments; the left knee had localized medial joint line tenderness with equivocal McMurray's test,[7] medially, but the lateral joint line was  nontender; range of motion of the left knee was limited to five to 95 degrees, with pain and guarding and anteromedial swelling,  but no joint effusion; there was lesser tenderness along the medial  patella  retinaculum;  there  was  no  significant  swelling  of  the  lower

---

[7] McMurray's test is used to determine the presence of a meniscal tear within the knee. *See* https://www.physio-pedia.com/McMurrays_Test (last visited Apr. 19, 2023).

extremities; Homan's test[8] was negative, bilaterally; ankles and feet were benign, bilaterally, with good range of motion and stable ligaments; deep tendon reflexes were 2+ and symmetric throughout, except for ankle jerk reflexes, which were 1+ and symmetric, bilaterally; he could stand on heels and toes without difficulty; he could squat to only 30 degrees at the hips and knees due to increased low back pain and left knee pain; he had a normal gait, albeit somewhat slow; and he required no assistive device for ambulation. (R. at 378.)

Dr. Stephenson opined Pruitt could stand and/or walk one to two hours total per day, but would require breaks during any periods of standing or walking; he could sit upright in a standard chair for a maximum of one hour per day, with breaks; he did not require an assistive device for ambulation, but he would be unable to walk on uneven terrain; he could lift and carry 10 pounds occasionally from waist level, but he could not do any lifting from floor to waist level; he could not do any bending or stooping or crouching; he would have no manipulative limitations with his upper extremities, including reaching, handling, fingering, etc., which he could do frequently; he had no relevant visual or communicative limitations; he would be unable to climb ladders; and he would be unable to do any prolonged driving for more than 30 to 60 minutes at a time. (R. at 378-79.) Based on his review of Pruitt's medical records, his history and his current evaluation, Dr. Stephenson opined Pruitt's disability dated back to his date of last employment. (R. at 379.)

Pruitt continued to receive pain management treatment with Dr. Joiner's office after the expiration of his date last insured for back and knee pain.[9] In June

---

[8] Homan's test is a physical examination procedure used to test for deep vein thrombosis. *See* https://www.physio-pedia.com/Homan%27s_Sign_Test (last visited Apr. 19, 2023).

[9] The court includes these treatment notes herein because Pruitt argues the ALJ erred in his

and October 2017, he saw Webb and Rebecca A. Mabry, F.N.P., a family nurse practitioner, respectively. (R. at 763, 768.) In June 2017, he reported decreased left knee pain due to an increased meloxicam dosage, but in October 2017, he reported worsened knee pain. (R. at 763, 768.) In June 2017, a physical examination showed decreased lumbar lordosis; evidence of lumbar nerve root irritation; and tenderness to palpation of the medial joint line of the left knee. (R. at 770-71.) Otherwise, findings were normal, including normal lumbar range of motion; full strength; no muscle atrophy, decreased range of motion or crepitus in the left knee; normal gait; and intact sensation. (R. at 770-71.) Webb diagnosed low back pain; lumbosacral disc degeneration; bilateral knee pain; lumbar disc disorder with myelopathy; myalgia; muscle spasm of the back; lumbar intervertebral disc degeneration; chronic pain syndrome; lumbar spondylosis with radiculopathy; and Type 2 diabetes mellitus with nephropathy. (R. at 771.) In October 2017, Pruitt's examination was the same, except there also was tenderness to palpation of the paraspinal region at L3-S1. (R. at 765-66.) In addition to Webb's diagnoses, Mabry diagnosed primary osteoarthritis of the left knee and intervertebral disc degeneration of the lumbosacral region. (R. at 766.) Pruitt received a left knee injection, and his medications were continued. (R. at 766-67.)

Pruitt began treating with Jonathan R. Shelton, P.A.-C, a certified physician assistant for Dr. Joiner, on January 15, 2018, for continued back and left knee pain. (R. at 758.) Pruitt reported occasional numbness and tingling in his toes. (R. at 758.) He stated his back pain was unchanged and aggravated by bending, and his knee pain was worse and aggravated by going up steps. (R. at 758.) He stated nothing alleviated his knee pain, but stretching out in a recliner with his arms above

consideration of the opinion evidence pertaining to one of the providers associated with Dr. Joiner's office, rendered after the date last insured.

his head helped his back pain, and he reported physical therapy had provided temporary relief in the past. (R. at 758.) Pruitt stated he was pleased with his current pain regimen. (R. at 758.) Physical examination remained unchanged, and Shelton added osteoarthritis of the right knee to Pruitt's diagnoses. (R. at 760-61.) He noted that the injection at Pruitt's last visit increased Pruitt's blood sugar level significantly. (R. at 762.) Therefore, he would schedule viscosupplementation injections[10] for Pruitt's left knee. (R. at 762.)

On January 25, 2018, Shelton completed a physical assessment of Pruitt, finding he could stand/walk less than two hours in an eight-hour workday and sit about two hours in an eight-hour workday. (R. at 9.) Shelton opined Pruitt could occasionally lift and carry less than 10 pounds, but never more than that. (R. at 9.) He opined that Pruitt's pain or other symptoms often were severe enough to interfere with his attention and concentration, and his impairments were likely to produce "good days" and "bad days." (R. at 9.) Shelton opined Pruitt was likely to be absent from work, on average, due to his impairments or treatment more than four times monthly. (R. at 9.) He further opined Pruitt would need to elevate his legs to waist level at least two hours daily. (R. at 9.) Finally, Shelton opined Pruitt's limitations related back to October 13, 2014, Pruitt's alleged onset date. (R. at 10.)

Pruitt saw Shelton for a series of viscosupplementation injections to his left knee from March 1 through March 22, 2018, which he tolerated well. (R. at 743, 751, 753, 757.)   His physical examinations remained unchanged, as did his

---

[10] Viscosupplementation is a procedure in which a thick fluid called hyaluronate is injected into the knee joint to improve the lubricating properties of the synovial fluid, reduce the pain from osteoarthritis, improve mobility and provide a higher and more comfortable level of activity. *See* https://www.my.clevelandclinic.org/health/articles/14982-viscosupplementation-for-osteoarthritis-of-the-knee (last visited Apr. 19, 2023).

diagnoses.  (R. at 745-46, 750-51, 755-56.)  On April 9, 2018, Pruitt advised Shelton the third injection provided 50 percent relief overall, and he felt he could navigate steps easier.  (R. at 738.)  His examination was the same, except Shelton examined Pruitt's right knee, which was tender at the medial joint line.  (R. at 740-41.)  Shelton mentioned the possibility of viscosupplementation injections to the right knee, and he noted he would consider additional left knee injections in September.  (R. at 741-42.)  On July 2, 2018, Pruitt reported that, although the left knee injections provided 50 percent overall relief and an improved ability to navigate steps, they did not help with everyday pain.  (R. at 733.)  His examination and diagnoses were unchanged, Shelton continued his medications, and he noted Pruitt may undergo a right knee injection if his pain worsened.  (R. at 735-37.)  Pruitt continued to see Shelton through July 2019, over which time he reported unchanged back and knee pain, but new onset of right shoulder pain with limited range of motion in approximately April 2019.  (R. at 719.)  On July 1, 2019, examination of Pruitt's right shoulder showed tenderness to palpation without restricted range or instability, and testing for dislocation, impingement, rotator cuff injury and thoracic outlet syndrome was normal.  (R. at 722-23.)  Shelton added right shoulder pain and right shoulder bursitis to Pruitt's diagnoses, for which he administered an injection.  (R. at 723-24.)  By September 23, 2019, Pruitt reported continuing right shoulder pain, radiating down to his elbow.  (R. at 713.)  He also reported 80 percent relief from the injection, lasting for two weeks and improving his ability to groom himself and perform household chores.  (R. at 713.)  Shelton found Pruitt was stable on current medications, and Pruitt declined injections at this visit.  (R. at 713.)  Physical examination remained unchanged, as did Shelton's diagnoses, and he continued Pruitt's medications.  (R. at 716-18.)  X-rays of Pruitt's lumbar spine, dated October 14, 2019, showed relatively severe narrowing at the L5-S1 disc space, unchanged from the previous December 2014 x-rays, as well as large hypertrophic spurs at the

L5-S1 and L1-L2 spaces.  (R. at 800.)

Pruitt returned to Shelton on November 25, 2019, reporting worsened lower back pain after sneezing four weeks previously.  (R. at 707.)  He also reported seeing a doctor for his right shoulder, who believed his pain was due to a spur.  (R. at 707.)  He stated that TENS therapy was effective for both his back and his shoulder.  (R. at 707.)  Physical examination remained unchanged, as did Shelton's diagnoses.  (R. at 710-11.)  Shelton continued Pruitt's medications, he advised him to continue home exercises, and he ordered a lumbar MRI.  (R. at 712.)  On January 14, 2020, Pruitt reported improved pain since his prior visit and an improved ability to rise and stand.  (R. at 701.)  He declined injections.  (R. at 701.)  Again, Pruitt's examination and Shelton's diagnoses remained unchanged.  (R. at 704-05.)  An MRI of the lumbar spine, dated December 3, 2019, showed a small central disc bulge at the L5-S1 level, mildly effacing the ventral thecal sac; mild, bilateral neural foraminal stenosis at L3-L4 and L4-L5 without nerve root impingement; and moderate, bilateral neural foraminal stenosis at the L5-S1 level.  (R. at 801.)  Shelton continued Pruitt's medications and advised him to continue home exercises.  (R. at 706.)

Shelton completed another physical residual functional capacity assessment of Pruitt on January 19, 2020, which largely mirrored his previous one from January 2018.  (R. at 804-05.)  In addition, he opined that Pruitt would "often" need to rest or lie down in addition to regular breaks.  (R. at 804.)  Shelton also did not address whether Pruitt needed to elevate his legs during the day.

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20

C.F.R. § 404.1520 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless*

*Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Pruitt argues the ALJ erred by failing to perform a proper function-by-function analysis. (Memorandum In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-10.) He also argues the ALJ erred in his residual functional capacity determination by improperly evaluating the opinion evidence. (Plaintiff's Brief at 10-15.)

The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2022); *see also* 20 C.F.R. § 404.1527(d)(2) (2022) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner). The relevant question is whether the ALJ's residual functional capacity assessment is based upon all the relevant evidence, including medical records, medical source opinions and the claimant's subjective allegations and description of his own limitations. *See* 20 C.F.R. § 404.1545 (2022).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a). The ALJ found Pruitt had the residual functional capacity to perform sedentary work, except he could not push, pull, lift or carry more than 10 pounds; there could be almost no stooping (i.e. negligible), as an independent posture, apart from the bending at the waist required to achieve a seated position (i.e. stoop/bend at the waist once for each time taking a seated position); he could occasionally crouch, climb steps and balance, but he could not crawl or climb ladders or scaffolds, and he could not kneel; he would need to stand up to five minutes each hour from a seated position at the workstation; he

should avoid hazards, such as machinery with moving parts and unprotected heights; and he could frequently, but not constantly, reach, bilaterally. (R. at 395.)

Pruitt argues that the ALJ erred by improperly evaluating the opinion evidence in arriving at his residual functional capacity finding. In particular, he argues the ALJ failed to properly evaluate the opinions of physical therapist Evans, consultative examiner Dr. Stephenson and treating provider Shelton. In making his residual functional capacity finding, the ALJ stated he was giving "some weight" to Evans's December 2014 opinion that Pruitt could, among other things, sit and stand for less than four hours in an eight-hour workday; walk for less than two hours in an eight-hour workday; occasionally carry 20 pounds; and frequently carry 10 pounds because such standing and walking limitations were more restrictive than those found by the state agency physicians, which he had found were an overestimate of Pruitt's abilities. (R. at 401.) The ALJ further noted that Evans's opinions generally were more consistent with his ultimate residual functional capacity finding. (R. at 401.) However, the ALJ also noted that Evans, a physical therapist, is not a physician. (R. at 401.) It appears the ALJ gave less weight to Evans's opinions because she is not, therefore, an acceptable medical source as defined by the Act. *See* 20 C.F.R. § 404.1502(a) (2022) (defining acceptable medical sources as licensed physicians, licensed or certified psychologists, and – for limited purposes – licensed optometrists, licensed podiatrists, qualified speech-language pathologists, licensed audiologists, licensed advanced practice nurses and licensed physician assistants). Evidence from such nonacceptable medical sources cannot be used to establish the existence of a medically determinable impairment, but they may "provide evidence, including opinion testimony, regarding the severity of the claimant's impairments and [how] such impairment[s] affect the individual's ability to function." *Ingle v. Astrue*, 2011 WL 5328036, at *3 (W.D. N.C. Nov. 7, 2011) (citing S.S.R. 06-03p,

WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013); 20 C.F.R. § 404.1527(a)). Finally, the ALJ noted that Pruitt's left knee and lumbar spine x-rays, performed in conjunction with the consultative examination, did not reveal much to support such restrictive findings, including a limitation to four hours of sitting. (R. at 401.) In particular, the left knee x-rays showed no significant abnormality, and the lumbar x-rays showed moderate narrowing of the L5-S1 disc space with large spurs and degenerative changes, as well as small spurs in the lower thoracic spine and upper two lumbar disc spaces.

In addition to these reasons properly cited by the ALJ for according "some weight" to Evans's opinion, the court also notes that Evans's own examination of Pruitt does not support such restrictive findings. For instance, Pruitt had normal sensation, full strength in all extremities, normal coordination, normal gait with heel walking, tandem and arm swing; normal station on both feet; normal reflexes; and normal range of motion of the shoulders, elbows, hips, ankles and wrists. (R. at 249, 251-52.) While Pruitt did exhibit decreased back and left knee range of motion, as well as a left antalgic gait pattern, Evans noted that Pruitt did not require an assistive device. (R. at 250, 252.) The court further notes that Evans's opinion was rendered in December 2014, approximately nine months prior to Pruitt's amended alleged onset date. Thus, it is not relevant to the period of review currently before the court.

Next, the ALJ gave "little weight" to the March 2017 opinion of Dr. Stephenson, who opined Pruitt could stand and/or walk for only one to two hours daily; and sit upright for a maximum of only one hour daily, finding it was inconsistent with the other evidence of record, as well as his own physical examination findings. (R. at 401.) Specifically, the ALJ stated that the medical evidence of record consisted of little treatment from 2016 through early 2017, and

the treatment from this time was conservative and provided by Pruitt's primary care provider, who did not impose any restrictions. (R. at 401.)  The court notes that, in addition to Pruitt's primary care provider, however, he also received treatment from pain management during this time.  Specifically, in August and December 2016, as well as March 2017, Pruitt continued to complain of back and left knee pain.  In August 2016, he received a trigger point injection in his low back, and in December 2016, he received a nerve block in the left knee based on his complaints of pain.  Physical examination findings during these visits revealed pain and tenderness over the lumbar musculature; full, but painful, left knee range of motion; and left knee crepitus.  Otherwise, however, findings were normal.  In March 2017, Pruitt's medications were continued, and his meloxicam was increased.  In any event, the court finds that these additional visits with pain management do not negate the ALJ's evaluation of Dr. Stephenson's opinion on the basis that there was little treatment during this time and that it was rather conservative in nature.  Lastly, the ALJ correctly noted that Dr. Stephenson opined Pruitt did not require an assistive device for ambulation, and an imaging study of the left knee revealed no significant abnormality. (R. at 401.)

Lastly, the ALJ gave "little weight" to the opinions of physician assistant Shelton, rendered in January 2018 and January 2020.  (R. at 401-02.)  In both opinions, Shelton found Pruitt could stand/walk for less than two hours and sit for two hours in an eight-hour day; he could occasionally lift less than 10 pounds; pain either "often" or "frequently" would interfere with Pruitt's attention/concentration; and he would be absent from work more than four times monthly.  In January 2018, Shelton opined Pruitt would need to elevate his legs to waist level at least two hours daily.  In January 2020, he opined Pruitt would require unscheduled breaks "often."  In both opinions, Shelton found the limitations related back to October 13, 2014.

The ALJ stated he was giving little weight to these opinions, as they were offered one to three years after the expiration of Pruitt's date last insured. (R. at 402.) Moreover, the ALJ stated that, despite pain due to knee and back conditions, Pruitt ambulated without an assistive device, and he had largely intact strength, sensation and range of motion. (R. at 402.) Furthermore, at his January 15, 2018, visit with Shelton, just 10 days prior to the first opinion he rendered, Shelton noted decreased lumbar lordosis and paraspinal tenderness, but normal range of motion and full strength. (R. at 402.) Regarding Pruitt's left knee, there was tenderness to palpation of the medial joint line, but no deformity or misalignment of the bones, no ecchymosis, erythema or signs of muscle atrophy, and he had normal range of motion and no instability. Thus, the ALJ noted that Shelton's physical examination findings did not support his extreme limitations. (R. at 402.) The ALJ further noted that, in January 2020, Shelton's examination findings were identical regarding Pruitt's left knee and lumbar back, but there were additional abnormalities regarding Pruitt's right knee and right shoulder. However, the ALJ correctly noted that Pruitt's right knee and right shoulder were not at issue prior to his date last insured. (R. at 402.) Additionally, although Shelton stated in his opinions that the limitations dated back to October 2014, the ALJ noted this was approximately one year prior to Pruitt's amended alleged onset date and, although the record showed some treatment by pain management in 2009, Shelton did not begin seeing pain management again until August 2015. (R. at 402.) Lastly, the ALJ correctly stated that, even though Shelton's second opinion, dated January 2020, contained additional limitations not contained in the initial January 2018 opinion, Shelton opined those limitations also related back to October 2014, which would be inconsistent with his earlier opinion. (R. at 402.)

For all the above-stated reasons, I find that substantial evidence exists to

support the ALJ's weighing of the medical evidence and his ultimate residual functional capacity finding.

Pruitt also argues that the ALJ erred by failing to adequately explain the specific functional limitations contained in the residual functional capacity finding, including how long he could sit and stand/walk in the course of an eight-hour workday, how much weight he could carry, his ability to stay on task considering his chronic pain and his likely absenteeism. It is true that in assessing a claimant's residual functional capacity, an ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis" before the residual functional capacity may be stated "in terms of the exertional levels of work. …" *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013), 1996 WL 374184, at *1 (July 2, 1996)); *see also Monroe v. Colvin*, 826 F.3d 176, 188-89 (4th Cir. 2016) (emphasizing the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and, if so, how often) (citation omitted). In *Mascio* and *Monroe*, the court remanded because the ALJ failed to adequately explain how he arrived at conclusions regarding the claimant's residual functional capacity. *See Mascio*, 780 F.3d at 636; *Monroe*, 826 F.3d at 189. The ALJ's residual functional capacity assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in the residual functional capacity finding. *Mascio*, 780 F.3d at 636 (quoting S.S.R. 96-8p, 1996 WL 374184, at *7). Here, Pruitt argues, specifically, that the ALJ failed to perform a proper function-by-function analysis of his following abilities: (1) how long he

could stand and walk in an eight-hour day; (2) how long he could sit in an eight-hour day; (3) how much weight he could carry; (4) how his chronic pain affected his ability to stay on task; and (5) his likely absenteeism.  Based on my review of the record, I find that Pruitt's arguments fail.

First, *Mascio* does not set out "a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." 780 F.3d at 636. Instead, remand should be considered "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).  Thus, Pruitt cannot claim error simply because the ALJ did not explicitly set forth a detailed analysis of each of his functional abilities as long as the ALJ's conclusions are ascertainable from his narrative discussion and supported by the record.  I find this is the case.

Here, the ALJ's decision includes the narrative discussion required by S.S.R. 96-8p and contains sufficient information to allow meaningful review.  Unlike the ALJ in *Mascio*, the ALJ in this case did not fail to consider conflicting medical evidence.  Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a thorough analysis of Pruitt's medical records, the medical opinions, Pruitt's hearing testimony and the ALJ's conclusions.  The ALJ's opinion specifies how the limitations in the residual functional capacity assessment correlate with his severe impairments.  Specifically, Pruitt's argument regarding the residual functional capacity assessment's exertional limitations for walking, standing and sitting are without merit.  Pruitt claims that the ALJ's failure to include specific limitations for standing, walking and sitting was

improper and, without such specific limitations, there is no way to determine whether he can perform the sedentary positions identified by the vocational expert. The ALJ relied on the vocational expert's testimony. At the hearing, the ALJ asked the vocational expert to consider a hypothetical individual of Pruitt's age and education, who was "capable of the sitting, standing, and walking limits, or requirements for sedentary work. …" (R. at 434.) Under the regulations, although sitting is involved in a sedentary job, a certain amount of walking and standing is often necessary in carrying out job duties, and jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a). Pursuant to S.S.R. 83-10, "occasionally," means "occurring from very little up to one-third of the time." 1983 WL 31251, at *5 (Jan. 1, 1983). This Ruling goes on to explain that "[s]ince being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." S.S.R. 83-10, 1983 WL 31251, at *5. For these reasons, the court finds that the ALJ's narrative discussion lends itself to meaningful judicial review on this point. Moreover, as set out in the discussion of the weighing of the medical opinion evidence, substantial evidence supports this residual functional capacity limitation.

The same is true for Pruitt's argument regarding the amount of weight he could lift. Again, the ALJ relied on the testimony of the vocational expert in finding Pruitt not disabled. The hypothetical presented to the vocational expert included the following: " … the ability to lift up to ten pounds, maximum, in the course of a work day, that would be sedentary. …" (R. at 434.) Pursuant to 20 C.F.R. § 404.1567(a), an individual who can perform sedentary work can lift items weighing up to 10 pounds at a time. Thus, the court finds that the ALJ's narrative discussion lends

itself to meaningful judicial review on this point.  Additionally, for reasons set forth in the discussion of the weighing of the medical opinion evidence, the court finds that substantial evidence supports this residual functional capacity limitation.

Pruitt also argues the ALJ failed to specifically discuss his absenteeism.  In particular, the providers whose opinions Pruitt argues the ALJ improperly weighed, found he would be absent from work more than four days monthly.  However, I am not persuaded by Pruitt's argument. In his decision, the ALJ noted Pruitt's reports that he was missing two days of work monthly during the last couple of months he worked at his previous job.  (R. at 400.)  However, the ALJ correctly stated this job was categorized at the light level of exertion, both by the vocational expert and as described by Pruitt.  (R. at 400.)  The ALJ further found that there was no evidence Pruitt could not perform work that allowed a sit/stand option or work that provided ordinary breaks – limitations the ALJ included in the ultimate residual functional capacity finding.  (R. at 400.)  Thus, the court finds the ALJ's narrative discussion lends itself to a meaningful review on this point.  Again, based on the evidence set out in the discussion above with regard to the weighing of the opinion evidence, I find that substantial evidence supports the inclusion of such limitations in the residual functional capacity finding.

Lastly, Pruitt argues the ALJ erred by failing to perform a function-by-function analysis of how his chronic pain affected his ability to stay on task.  A claimant's subjective allegations of pain and limitations are not conclusive.  Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements regarding impairments and symptoms.  *See* S.S.R. 16-3p, 2017 WL 5180304 (Oct. 25, 2017); 20 C.F.R. § 404.1529(b)-(c) (2022).   First, the ALJ looks for objective medical evidence

showing a condition that could reasonably produce the alleged symptoms, such as pain. *See* S.S.R. 16-3p, 2017 WL 5180304, at *3; 20 C.F.R. § 404.1529(b). Second, the ALJ must evaluate the intensity, persistence and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. *See* S.S.R. 16-3p, 2017 WL 5180304, at *3; 20 C.F.R. § 404.1529(c). In making that determination, the ALJ must examine the entire case record, including the objective medical evidence; an individual's statements regarding the intensity, persistence and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record. *See* 20 C.F.R. § 404.1529(c).

Here, the ALJ followed the required two-step process and first determined that Pruitt's medically determinable impairments could reasonably be expected to cause the alleged symptoms, including pain. (R. at 399.) The ALJ set forth Pruitt's subjective complaints regarding the intensity, persistence and limiting effects of his symptoms in detail in his opinion. In step two, however, the ALJ concluded that Pruitt's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. at 399.) In particular, the ALJ noted Pruitt's testimony that he had difficulty standing for long periods and could barely bend over without experiencing spasm or radiating pain down the right leg. The ALJ further noted that he accounted for this in the residual functional capacity finding. The ALJ pointed to the left knee MRI, which revealed no evidence of a well-defined tear, and that, at the consultative examination with Dr. Stephenson, Pruitt had a left antalgic gait pattern, but he did not require use of an assistive device for ambulation. Moreover, the ALJ noted that Pruitt's motor strength and sensation were intact in the lower extremities. While a subsequent evaluation showed Pruitt exhibited decreased range of motion of the left

knee with medial joint line tenderness and a limited ability to squat due to increased low back and left knee pain, he had no edema, he had normal range of motion of the ankles and feet with stable ligaments, he could stand on his heels and toes without difficulty, he had a normal gait, and he did not require an assistive device to ambulate. Moreover, the ALJ recognized that Pruitt had undergone prior surgeries on his left knee and back prior to the alleged onset date, but there was no evidence of increased treatment at the time of the initial alleged onset date of August 15, 2012. The ALJ noted that, in fact, there was no evidence of increased treatment after the alleged onset date until February 2013. According to the ALJ, Pruitt's amended alleged onset date to September 11, 2015, supports this lack of evidence. Furthermore, the ALJ stated that the medical evidence from 2016 to early 2017 revealed little treatment, and the treatment undergone mainly was conservative in nature with no restrictions imposed. Pruitt saw his pain management provider every three to four months for medication refills and occasional injections and nerve blocks with largely consistent examination findings. The ALJ also stated that no treating physician had recommended Pruitt lie down in a recliner to relieve his pain. Lastly, the ALJ noted that the medical evidence did not support Pruitt's claim of limited activities of daily living. In particular, Pruitt stated he did not perform household chores, and on bad days he did nothing around the house. However, the ALJ pointed to the September 2015 MRIs of the lumbar spine and left knee, which showed, respectively, degenerative changes, but no evidence of nerve root impingement; and evidence of a prior surgery, but no evidence of a well-defined tear. The ALJ also noted that physical examinations revealed decreased cervical and lumbar range of motion, but Pruitt had not experienced loss of strength or motor function, and he had not required an assistive device for ambulation.

For all these reasons, I find that the ALJ built "an accurate and logical bridge

from the evidence to his conclusion" in his discussion of the medical and nonmedical evidence, Pruitt's alleged symptoms and the medical opinions of record. Pruitt's complaints of pain were acknowledged and considered by the ALJ, and the ALJ provided reasoning for his conclusion that, despite his back and knee pain, Pruitt could perform a limited range of sedentary work. In sum, the ALJ considered Pruitt's complaints and explained why the evidence did not support greater residual functional capacity restrictions. This narrative discussion allows this court to see how the evidence of record supports the ALJ's residual functional capacity determination. Because the court was not "left to guess" at how the ALJ reached his residual functional capacity determination, I find that the ALJ's conclusion is supported by substantial evidence. *Mascio*, 780 F.3d at 637.

For the above-stated reasons, I find the ALJ's conclusions are ascertainable from his narrative discussion and supported by the record, thereby allowing for meaningful review by the court. That being the case, I find that the ALJ did not err by failing to perform a function-by-function analysis of Pruitt's work-related abilities before crafting his residual functional capacity finding, which is substantially supported by the evidence referenced above.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists in the record to support the ALJ's

residual functional capacity finding; and

3. Substantial evidence exists in the record to support the
   Commissioner's finding that, as of the date last insured,
   Pruitt was not disabled under the Act and was not entitled to
   DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Pruitt's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the

Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    June 1, 2023.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE